**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

| | |
|---|---|
| **RONALD MOORE, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 2:14-cv-02089-STA-cgc** |
| ) | |
| **CITY OF MEMPHIS, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

---

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
---

Before the Court are Defendant City of Memphis's Motion for Summary Judgment (ECF No. 108) and Defendant Phillip Penny's Motion for Summary Judgment on claims against him in his individual and official capacities (ECF No. 110), both filed on April 29, 2015. Plaintiffs Ronald Moore, as son, next of kin, and Administrator Ad Litem/Personal Representative of the Estate of Donald Moore, Sr., Deceased; Gina Waldrop, as daughter and next of kin of Donald Moore, Sr., Deceased; and Donald Moore, Jr., son and next of kin of Donald Moore, Sr., Deceased, have responded in opposition (ECF Nos. 125, 127) to Defendants' Motions, and Defendants have filed separate reply briefs (ECF Nos. 132, 135). For the reasons set forth below, both Motions for Summary Judgment are **GRANTED**.

## BACKGROUND

In their Complaint (ECF No. 1-2), Plaintiffs allege that Defendant City of Memphis and Defendant Phillip Penny are liable for the deprivation of the constitutional

rights of their father, Donald Moore, Sr., pursuant to 42 U.S.C. § 1983. Defendants now seek judgment as a matter of law on Plaintiffs' claims for relief.

Pursuant to Local Rule 56.1(a), Defendants have prepared separate statements of facts "to assist the Court in ascertaining whether there are any material facts in dispute."[1] A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law."[2] A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact.[4] As the non-moving party, Plaintiffs must respond to Defendants' statements of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed."[5] Additionally, Plaintiffs may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[6]

Where Plaintiffs assert that a genuine dispute of material fact exists, Plaintiffs

---

[1] Local R. 56.1(a).

[2] *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

[3] *Anderson*, 477 U.S. at 248.

[4] Fed. R. Civ. P. 56(c)(1).

[5] Local R. 56.1(b).

[6] Fed. R. Civ. P. 56(c)(2).

must support their contention with a "specific citation to the record."[7]  If Plaintiffs fail to demonstrate that a fact is disputed or simply fail to address Defendants' statement of fact properly, the Court will "consider the fact undisputed for purposes" of ruling on the Motion.[8]  Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record."[9]

## I. Factual Background

The Court finds that there is no genuine dispute as to the following material facts, unless otherwise noted.[10]  On January 11, 2013, the decedent, Donald Moore, Sr., was a 67 year-old single male, living alone at 10038 Cameron Ridge Road, Cordova, Tennessee.  (Def. City of Memphis's Statement of Undisputed Facts ¶ 1.)  Phillip Penny was a Memphis Police Department ("MPD") officer assigned to the TACT squad ("TACT").  (Id.)  TACT, which is an acronym for "Tactical Apprehension and

---

[7] Local R. 56.1(b).

[8] Fed. R. Civ. P. 56(e)(2); *see also* Local R. 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment.").

[9] Fed. R. Civ. P. 56(c)(3).

[10] Defendant Phillip Penny has filed his own statement of undisputed facts in support of his separate Rule 56 Motion.  Many of the facts in Officer Penny's statement of undisputed facts facts duplicate the facts asserted by Defendant City of Memphis.  And some of the facts cited by Officer Penny provide additional background about Animal Services' investigation of the complaints against Mr. Moore.  But much of that evidence is not actually material to the questions of law presented at summary judgment.  The Court notes Officer Penny's statement of undisputed facts for the record.  For the sake of clarity, the Court will cite primarily to Defendant City of Memphis' statement of facts here.  To the extent that Officer Penny's statement of facts includes material facts not found in the City of Memphis' statement of undisputed facts, the Court discusses the evidence below.

Containment Team," is the MPD's name for its special weapons and tactics team, popularly known as SWAT. (*Id.* ¶ 3.) According to its Standard Operating Procedure Manual, TACT's primary objective is to "resolve high-risk situations utilizing a minimum force, resulting in a minimum of personal injury and property damage." (*Id.* ¶ 4.)[11] One high-risk situation for which TACT is utilized is the service of search warrants where a likelihood of gunfire or other violence exists. (*Id.* ¶ 5.)

### A. Initial Contact between Moore and Animal Services

Carol Lynch was an Animal Control Officer with Memphis Animal Services ("Animal Services"), a department of the City of Memphis. (*Id.* ¶ 6.)[12] Lynch's job is to enforce city ordinances regarding the treatment and condition of animals, particularly pets. (*Id.* ¶ 7.) Lynch responds to and investigates complaint calls and issues citations when necessary to enforce Memphis City Ordinances. (*Id.* ¶ 8.) Animal Services had received at least one complaint regarding Moore's treatment of his pets and conducted an

---

[11] Plaintiffs dispute this statement, arguing that the facts of the case at bar call into question whether TACT uses only "minimum force" with a "minimum of personal injury." Plaintiffs contend that the use of assault weapons and flash bangs to serve a search warrant is "hardly minimal force." Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts ¶ 4 (ECF No. 125-1.) The Court finds that Defendant's statement merely reflects the MPD policy announced in TACT's Standard Operating Procedure Manual. Plaintiffs have not shown how that policy statement is genuinely in dispute. Defendants have not specifically offered the statement to make assertions about the use of TACT to serve search warrants generally or the TACT's use of force in this instance specifically.

[12] Plaintiffs correctly point out Ms. Lynch stated in her deposition that she was an employee of the "Memphis Animal Shelter." Resp. to Def. City of Memphis's Statement of Undisputed Material Facts ¶ 6 (citing Lynch Dep. 4:22–23, Apr. 28, 2015). The Memphis Animal Shelter is an older name for the department, which was renamed Memphis Animal Services in 2004. CITY OF MEMPHIS, *Animal Service - About Us*, http://www.memphistn.gov/Government/ParksNeighborhoods/AnimalServices/AnimalSe rviceAboutUs.aspx.

investigation for animal cruelty in September 2012. (*Id.* ¶¶ 9, 10.)[13] Lynch attempted to follow up on the investigation by contacting Moore at his residence in October 2012 but at a time when Moore was not at home. (*Id.* ¶ 11.) During her follow-up visit, Lynch observed over the backyard fence that the back door to Moore's house was open, and chickens and rabbits were going in and out of the house. (*Id.*) She also observed "clutter and trash" and smelled urine. (*Id.*) Before leaving Moore's property, Lynch spoke with one of Moore's neighbors who expressed she was very terrified of Moore and commented that Moore had threatened her. (*Id.* ¶ 12.)[14]

---

[13] Plaintiffs dispute these phone call complaints, first noting that the record only refers to one call in June 2005 that was cancelled and disregarded and another call in September 2012. Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts, ¶¶ 9–10. Plaintiffs then correctly note that five lines of the record cited by the City do not support the statement of fact. *Id.* ¶ 10. However, other portions of Ms. Lynch's deposition, as cited by the City, support the City's statement of fact regarding the September 2012 complaint and investigation:

> Q.     What does this entry on September 5th, 2012 tell you?
> A.     The one at 4:25?
> Q.     Yes.
> A.     That's Officer Marandia.
> Q.     Can you interpret it? What is INV cruelty? Investigating potential cruelty?
> A.     Yes, sir. . . .
> Q.     So can you tell us what Marandia is telling us by her entry concerning the September 5th incident?
> A.     She left a warning, which is an NTC notice to comply, and an ordinance card explaining the law.

Lynch Dep., 121:20–122:3, 122:12–16.

[14] Plaintiffs have questioned the identity of the neighbor who spoke with Lynch. Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts, ¶¶ 12, 15. As Plaintiffs correctly note, the proof cited does not support the City's assertion that the neighbor was a Ms. Hillis.

> A.     It was in I believe October, and I had spoken with a neighbor who was on the west side, and she was very terrified of him.
> Q.     Was that Ms. Hillis?

Due to her concerns about Moore, Lynch sought out assistance from MPD and returned with officers some time later on October 15, 2012. (Def. Penny's Statement of Undisputed Facts ¶ 14; Def. City of Memphis' Statement of Undisputed Facts ¶ 13.)[15] Moore was home and came out of the front door gesturing with his hand behind his back like he had a weapon. (*Id.*) Because she was not wearing a protective vest, Lynch moved toward Moore's garage for cover. (Def. Penny's Statement of Undisputed Facts ¶ 24.) The MPD officers accompanying Lynch ordered Moore to show his hands and asked for identification, but he would not comply. (*Id.* ¶ 23.) One of the officers who had training as a crisis intervention team ("CIT") officer tried to talk to Moore and advised Moore that if he did not cooperate, the police would get a warrant. (*Id.* ¶ 28.) The officer told Moore the police just wanted to talk to him about his animals. (*Id.* ¶ 29.)

Moore cursed at the officers and then backed into his house and closed his door. (Def. City of Memphis' Statement of Undisputed Facts ¶ 13.) According to Lynch, Moore "seemed real angry or something." (*Id.* ¶ 14.) Thereafter, Lynch feared for her safety because she thought Moore was armed and going to hurt somebody, and so she refused to follow up on her investigation of the animal cruelty complaints without MPD

---

A.      No, I think she's on the other side.
Q.      What was this neighbor's name?
A.      I'm not sure.
Lynch Dep., 100:16–22.

Plaintiffs have also objected to the testimony as hearsay. The Court considers Plaintiffs' hearsay objections in more detail below.

[15] In examining Lynch's deposition, the Court is unable to ascertain the exact chronology of her conversation with the unnamed neighbor in relation to Lynch's separate appearances at Mr. Moore's residence. Lynch Dep. 124:8–140:14. Each Defendant's statement of facts suggests that Lynch made more than one attempt to contact Moore on October 15, 2012, and that MPD officers went with her on the second attempt. The exact sequence of the visits and any discrepancies in the testimony or the parties' briefs is not material to the Court's analysis.

protection. (*Id.* ¶ 16.) Plaintiffs add that Lynch described Moore as "scary" and "probably armed" and someone to be approached in daylight hours and not at night. (Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts ¶ 16.)

## B. Further Encounters with Moore and MPD

On January 8, 2013, Lynch contacted John Morgret, a criminal investigator for the Memphis Humane Society, for assistance. (Def. City of Memphis's Statement of Undisputed Facts ¶ 17.)[16] Morgret discovered one prior complaint to the Memphis Humane Society regarding Moore. (*Id.* ¶ 18.) Morgret and Lynch went to MPD's Appling Farms precinct and met with Lt. Martin Kula and Officer Scott Edwards, seeking assistance in their investigation of the animal cruelty complaints against Moore. (*Id.* ¶ 19.) Lt. Kula is a 25- year MPD veteran, and Officer Edwards has been an MPD officer since 2002 and is a trained crisis intervention team officer. (*Id.* ¶¶ 20, 23.) Officer Edwards had training in de-escalation techniques as well as how to deal with "mental consumers." (*Id.* ¶ 23.) A "mental consumer" is MPD's term for a citizen suffering from possible mental illness. (*Id.* ¶ 26.)

Lynch described her prior encounters with Moore to Lt. Kula, including the episode when Moore had gestured as though he had a gun behind his back, and Moore's generally uncooperative attitude. (*Id.* ¶ 21.) Based on Lynch's statements, Lt. Kula suspected that Moore might be "unstable." (*Id.* ¶ 22.) Lt. Kula assigned Officer Edwards to assist on the case because of his training in assessing whether someone was a mental

_____

[16] Plaintiffs question whether Morgret had authority to enforce state statutes regarding animal cruelty. The Court need not reach the issue because Defendants have not made such a claim as part of their summary judgment submissions and the issue has no bearing on the questions of law presented.

consumer. (*Id.* ¶ 25.) Officer Edwards researched Moore's history for any evidence of violence or mental health issues but saw nothing to indicate Moore was a mental consumer. (*Id.* ¶¶ 27, 28.)[17] Lt. Kula sent Officer Edwards and another officer to accompany Lynch and Morgret to Moore's residence on January 8, 2013. (*Id.* ¶ 29.) When they found that Moore was not at home, Officer Edwards and other officers returned later the same day around 8:00 p.m. and made contact with Moore. (*Id.* ¶¶ 29, 30.)[18]

Officer Edwards talked with Moore through the door and explained to him that Animal Services just wanted to investigate the condition of Moore's animals. (*Id.* ¶ 31.) Moore refused to open the door or cooperate in any way. (*Id.*) Instead, he ordered everyone off of his property and called 911. (*Id.*) Officer Edwards testified that Moore

---

[17] As Plaintiffs noted, Officer Edwards indicated in his deposition that the mere fact that he was involved with the investigation would have been because of a suspicion that Mr. Moore was a mental consumer. Edwards Dep. 25:1–7.

[18] Plaintiffs dispute the City's claim that Lynch was present with the officers on the return visit on January 8, 2013. Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts, ¶ 30.

> Q. Okay. And then you went back. You think it was Ms. Lynch who – was it Ms. Lynch who called you back to the house?
> A. I don't remember who called us, but we were all there together. They were with us, so I know we didn't just show up because they were with us. . . .
> Q. And who all was on the scene at that time?
> A. Me and Officer Battle and some patrol officers. I don't remember who they were. I wasn't riding with them I don't think. We wouldn't have went over there by ourselves. I know there was a couple officers there.

Edwards Dep., 31:9–15, 31:23–32:5. The Court finds the testimony ambiguous. Officer Edwards's first answer suggests Lynch may have been present for the return visit; his second answer suggests she was not.

"didn't sound delusional or manic or hallucinating or anything like that. He just sounded like another person that didn't want us on his property." (*Id.* ¶¶ 32, 33.)[19] During his call to 911, Moore was either routed to Lt. Kula or made a separate call to the Appling Farms precinct and spoke with Lt. Kula. (*Id.* ¶¶ 31, 34.) During his conversation with Lt. Kula, Moore was upset, ordered MPD to stay off of his property, and wanted MPD to leave him and his animals alone. (*Id.* ¶ 35.)[20] Lt. Kula tried to persuade Moore to cooperate and talk with MPD and Lynch, but Moore repeatedly refused. (*Id.* ¶ 36.)[21] Based on his conversation with Mr. Moore, Lt. Kula thought Moore was "normal" but "angry" and did not "want to be bothered with the police or animal control." (*Id.* ¶ 37.)[22]

---

[19] *Id.* 47:23–48:3. The parties dispute whether Officer Edwards attempted to evaluate Mr. Moore for indications of being a mental consumer during his interactions with him on January 8, 2013. Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts, ¶¶ 32–33. The City contends that Officer Edwards attempted to evaluate Moore; Plaintiffs argue Officer Edwards was unable to perform any such evaluation based upon his brief interactions with Moore.

[20] The parties dispute whether "[Mr.] Moore was clear he would not cooperate with MPD" at this juncture. *Id.* ¶ 35.

[21] Plaintiffs emphasize that Moore's refusal to cooperate occurred "before anyone obtained a search warrant." *Id.* ¶ 36.

[22] Plaintiffs dispute the City's characterization of Lt. Kula's testimony about Moore as "normal" but "angry" and uncooperative. *Id.* ¶ 37. Plaintiffs specifically argue that "Lt. Kula never testified that Moore was 'angry' or seemed that way to him." *Id.* In his deposition, however, Lt. Kula did say that Mr. Moore was angry.

> Q.     Okay. And what you testified to earlier about your conversation with Mr. Moore on the telephone, that's all you recall about – about that transpiring?
> A.     That he was normal, he was just *angry*, didn't want to be bothered with the police or animal control.

Kula Dep., 102:4–10 (emphasis added).

Lt. Kula informed Lynch and Morgret that they would have to pursue their investigation through the court system and obtain a search warrant. (*Id.* ¶ 38.) Plaintiffs add that Lt. Kula testified that he told Lynch and Morgret MPD did not have time to force Moore to talk. (Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts, ¶ 38.) At some point after January 8, 2013, one of Moore's neighbors contacted Lynch and informed her Moore had come out of his home with a gun and said that if Lynch returned, he would kill her. (Def. Penny's Statement of Undisputed Facts ¶ 54.) Morgret also testified that his concern for safety was heightened after Lynch received the report from Moore's neighbor that Moore was going "shoot first and ask questions later if officers returned to his house." (*Id.* ¶ 55.)[23]

## C. The Search Warrant and the Decision to Use TACT

On January 9, 2013, Morgret and Lynch met with a Shelby County Assistant District Attorney. (Def. City of Memphis's Statement of Undisputed Facts ¶ 39.) They set out the facts supporting probable cause for a search warrant to further their investigation of Moore for violations of animal safety laws. (*Id.*) Morgret obtained the search warrant on January 10, 2013. (*Id.* ¶ 40.) Morgret and Lynch then sought assistance from MPD to execute the search warrant. (Def. Penny's Statement of Undisputed Facts ¶ 58.) Morgret had been trained to get MPD involved whenever an investigation of animal cruelty involved a threat of violence. (*Id.*)

---

[23] According to Morgret, Lynch told him about the information she received from Moore's neighbor about the threat. Morgret Dep. 84:1-15 (ECF No. 94-3). Morgret testified that this report only heightened his concern for the safety of the investigators. The Court discusses in more detail below Plaintiffs' hearsay objection to the admissibility of Morgret's testimony and other evidence of Moore's alleged threats.

On January 10, 2013, Lynch and Morgret spoke with Col. Ryall of MPD Special Operations. (*Id.* ¶ 59.) Lynch explained to Col. Ryall Mr. Moore's refusal to cooperate during previous visits to his home, the threats Moore had made, and her fears for safety as a result of the threats. (*Id.* ¶ 60.)[24] Lynch showed Col. Ryall pictures of Moore's residence and described the foul odor emanating from the property. (*Id.* ¶ 61.) Lynch suggested that Moore was perhaps a hoarder. (*Id.* ¶ 63.) Lynch also discussed Moore's threatening behavior and his overall appearance during her encounters with him. (*Id.* ¶ 62.) Morgret and Lynch expressed concern for officer safety. (*Id.* ¶ 64.) Col. Ryall took a full report, and another officer informed Morgret and Lynch MPD would be in touch when the police were ready to execute the warrant. (*Id.* ¶¶ 65, 66.)

On the following morning, January 11, 2013, Morgret and Lynch were notified to come to the Appling Road precinct at 10:00 a.m. (*Id.* ¶ 67.) Upon their arrival, Morgret and Lynch were directed to meet MPD officers at Moore's residence. (*Id.* ¶ 68.) When they got to Moore's house, Morgret and Lynch found two patrol officers and two patrol cars. (*Id.* ¶ 69.) The patrol officers told them a sergeant had also been present but left when Moore would not come to the door. (*Id.*) The officers believed Moore was at home because his vehicle was in the driveway. (*Id.* ¶ 70.) Lynch summoned the sergeant back to Moore's house, and the sergeant again knocked on Moore's door. (*Id.* ¶ 71.) When Moore did not answer the door, the sergeant suggested that he, Morgret, and Lynch "just go in" to the house. (*Id.* ¶¶ 72, 73.) Lynch refused to go into the home with only

---

[24] Plaintiffs do not dispute this statement but add that the information was not conveyed to Deputy Chief Berryhill before he authorized the TACT unit to serve the warrant and that MPD did not verify Lynch's information.

one sergeant; Lynch was fearful of "walking into something" because Moore had told his neighbor he wanted to kill Lynch. (*Id.* ¶¶ 74, 75.)

Upset that MPD had sent only one sergeant to assist with executing the warrant, Lynch returned to her office and contacted Lt. Smith at the Appling Road precinct. (Id. ¶¶ 77. 78.) Morgret and Lynch later met with Lt. Colonel Marcus Worthy, the officer in charge of the Appling Farms precinct. (Def. City of Memphis' Statement of Undisputed Fact ¶ 41.) Lt. Col. Worthy confirmed that the search warrant was good. (*Id.*) Morgret and Lynch briefed Lt. Col. Worthy on Moore's conduct, describing his threatening nature, his hand gestures like he had a gun, and the possibility that he was armed. (*Id.* ¶ 42.) Lt. Colonel Worthy decided to dispatch two officers to investigate the neighborhood. (*Id.* ¶ 43.) Although Moore was not at home, one of his neighbors spoke to the officers. (*Id.*) The neighbor informed the officers that after the recent visits to Moore's home, Moore had indicated to his neighbor that if anyone returned to his property regarding his animals, the individuals would get hurt. (*Id.*)[25] At this point Lt. Col. Worthy had information that Moore had shown a potential to be violent, had previously indicated he had a weapon, and was threatening Lynch and anyone else who came to his home to question him about his animals. (*Id*. ¶ 45.) Based on the information he had, Lt. Col. Worthy concluded that TACT assistance in serving the search warrant should be requested. (*Id*. ¶ 44.)

---

[25] Worthy Dep. 70:17–71:2, Apr. 28, 2015. Plaintiffs correctly point out that the record does not indicate that the neighbor who spoke with the officers was Ms. Hillis. Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts, ¶ 43. However, Plaintiffs do not object to the statement as hearsay, going so far as to acknowledge the content as undisputed. *Id.*

The parties disagree over how much input Lt. Col. Worthy had in the decision to use TACT and whether Lt. Col. Worthy had enough information to make such a decision. The City asserts that Lt. Col. Worthy participated in the decision to request TACT assistance in serving the search warrant. (*Id.* ¶ 42.) The City also asserts that Lt. Col. Worthy was a trained officer in crisis intervention and concluded that nothing about Moore's case suggested to him that Moore was a mental consumer. (*Id.* ¶ 46.) The facts showed that Moore may have been a "hoarder" and that Lynch may have had concerns Moore was "crazy." (*Id.*) Plaintiffs respond that Lt. Col. Worthy was no longer a crisis intervention officer and did not have independent authority to assign TACT to serve the search warrant. (Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts, ¶¶ 45, 46.) Plaintiffs also point out that Lt. Col. Worthy did nothing to undertake his own assessment about whether Moore was a mental consumer. (*Id.* ¶ 46.) Lt. Col. Worthy only had the accounts given by Morgret and Lynch about their encounters with Moore. The Court notes these disputes for the record. In the final analysis, however, Lt. Col. Worthy was only one officer in the chain of command who formed an opinion based on the information he was given about the need to send TACT to serve the search warrant at Moore's home.

Lt. Col. Worthy decided to contact Maj. Charles Morris, the commanding officer for TACT, and request assistance in serving the warrant. (*Id.* ¶ 48.)[26] Maj. Morris was the TACT Major and, as of January 2013, a 30-year veteran of MPD, though he had only assumed command at TACT one week before Lt. Col. Worthy contacted him about TACT executing the warrant at Moore's home. (*Id.*) Maj. Morris referred the request to

---

[26] Plaintiffs named Maj. Morris as a defendant in this action but dismissed their claim against him by stipulation (ECF No. 98) on April 28, 2015.

Deputy Chief of Special Operations Anthony Berryhill whose permission was required to use TACT. (*Id.* ¶ 49.) Deputy Director Berryhill approved the use of TACT to assist in serving the search warrant based on the following information he was given: (1) a search warrant was issued; (2) Moore had threatened animal control officers, (3) Moore gestured to MPD officers as if he had a weapon; and (4) Moore's neighbor said that Moore may have a weapon and was threatening to harm MPD officers if they returned to his property.[27] Deputy Director Berryhill did not provide any guidance on how TACT should assist in serving the search warrant and allows the TACT to determine how to make its entrance onto property in these situations. (*Id.* ¶ 53.)

Plaintiffs assert a number of additional facts about Deputy Director Berryhill's decision to authorize the use of TACT in this case. Deputy Director Berryhill testified that a suspect should always be given the opportunity to cooperate because that presents the "least likelihood there's going to be a confrontation." (Pls.' Statement of Add'l Facts ¶ 103.)[28] Deputy Director Berryhill was never told that Moore had called 911 earlier in

---

[27] Plaintiffs dispute that Berryhill had information about Moore threatening to harm MPD officers. Plaintiffs' objection is noted. However, Deputy Director Berryhill testified as follows in his deposition:

> Q.      Okay. Going back now to the information that you were provided, try to tell me, I don't know that I've asked you this question yet, everything that you can remember about the phone conversation that you got, what you were provided.
> A.      Basically they had a warrant, a search warrant for a premise where there was a male who had threatened the animal control people. He gestured as if he had a weapon and that he threatened to do harm, and if I'm not mistaken, one of the neighbors also said that he may have had a weapon and threatened to – to do harm if police came to take his animals.

Berryhill Dep. 96:6–10, Apr. 28, 2015.

[28] The Court notes the City's additional cited statements from Deputy Director Berryhill's deposition. Resp. to Pls.' Additional Genuine Issues, ¶ 103.

the week because Moore became afraid when officers were knocking on his door.  (*Id.* ¶ 138.)  Deputy Director Berryhill did not know until after Moore was killed that Lynch thought Moore was "crazy."  (*Id.* ¶ 139.)  Deputy Director Berryhill was also never told that Moore was a potential mental consumer or that a dispatcher had labeled Moore a mental consumer during one of his calls to the police.  (*Id.* ¶ 140.)  Deputy Director Berryhill testified that if he had had this additional information, he would have asked more questions and considered other approaches before authorizing the use of TACT in serving the search warrant.  (*Id.* ¶ 141.)

**D. TACT Planning for Serving the Search Warrant**

On January 11, 2013, in the early afternoon, MPD visited Moore's residence again but did not make contact with him.  (Def. City of Memphis's Statement of Undisputed Facts ¶ 54.)  Around 4:00 p.m., a briefing occurred involving all in-service TACT officers, Lt. Col. Worthy, Lt. Kula, Officer Edwards, Lynch, and Morgret. (*Id.* ¶ 56.)  Lynch briefed the others on her prior encounters with Moore, Moore's gesturing like he had a gun behind his back, the issuance of the search warrant, and Moore's potentially dangerous behavior.  (*Id.*)  Morgret testified in his deposition that during the briefing either he or Lynch told the TACT officers about Moore's threats "to shoot first and ask questions later."  (Def. Penny's Statement of Undisputed Fact ¶ 96.)[29]  Morgret and Lynch stated that they did not see any evidence of a felony before the warrant was

_____

[29] Plaintiffs do not dispute that this statement was made during the briefing with the TACT officers.  Plaintiffs do assert that no one actually heard Moore use these exact words.   The relevance of the statements made during the TACT briefing is not whether Morgret or Lynch accurately quoted Moore but what effect their report had on the MPD officers and TACT unit members who heard about the alleged threat.

served.  (Pls.' Statement of Add'l Facts ¶ 109.)  No concern existed that Moore would conceal, destroy, or harm animals if given notice of a search warrant.  (*Id.* ¶ 111.)  No information about any officers previously going to Moore's home was mentioned during the planning meeting.  (*Id.* ¶ 131.)

Officer Philip Penny attended the January 11, 2013 briefing with Lynch and Morgret and was the TACT team leader assigned to assist in executing the search warrant.  (Def. City of Memphis's Statement of Undisputed Facts ¶ 62.)  Officer Penny had been on TACT since July 2003 and had served as Senior Team Leader and Senior Weapons and Tactics Instructor.  (*Id.* ¶ 57.)[30]  Officer Penny had also been Special Operations Officer of the Year.  (*Id.*)  At the time of this incident, Officer Penny was TACT's primary trainer and had specific training in serving search warrants.  (*Id.* ¶ 59.)  According to Officer Penny, "entry training" and securing a structure are the most important aspects of TACT's work and the "vast majority" of what TACT does.  (*Id.* ¶ 60.)  Officer Penny ideally had entry training sessions for TACT once a week.[31]

Officer Penny understood that TACT's involvement in Moore's case was to secure the residence so Animal Services could execute the search warrant and complete their investigation of animal cruelty complaints.  (*Id.* ¶ 63.)  Officer Penny was advised at

---

[30] Officer Penny was with MPD's Office of Homeland Security at the time of his deposition but is now assigned again to TACT.  The City also adds that at some point during his tenure as a TACT officer, Penny was previously terminated for killing a suspect who was a mental consumer.  (Def. Penny's Statement of Undisputed Facts ¶ 57.) Neither party has relied on this specific fact at summary judgment, and it is not clear how relevant it is to the questions of law presented in this case.

[31] Plaintiffs correctly point out that "Officer Penny did not testify he had entry training sessions once a week, but that the unit tried to have them once a week."  Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts, ¶ 61(citing Penny Dep. 94:18–95:1, April 28, 2015).

the briefing that, in prior encounters, Moore's gesturing, body language, and movements indicated that he was carrying a firearm and appeared to be unstable. (*Id.* ¶ 64.) Officer Penny examined the search warrant and was advised the warrant was part of an animal cruelty investigation, including the possibility of felony aggravated animal cruelty. (*Id.* ¶ 65.) Based on the information in the briefing, Officer Penny believed MPD was justified in assuming Moore was armed and dangerous or otherwise had lethal force in his possession. (*Id.* ¶ 66.) Officer Penny also did not believe Moore was "disturbed" or a "mental consumer" in light of the facts included in the briefing. (*Id.* ¶ 67.)

TACT's practice, if there is cause to believe the subject of a residential search warrant is armed, is to create a diversion in one area of the house, directing the person's attention there while officers enter at another point. (*Id.* ¶ 68.) As team leader, Officer Penny devised the plan for entering and securing Moore's residence. (*Id.* ¶ 69.)[32] The plan was to enter Moore's residence through the rear door. (*Id.* ¶ 70.) The officers would carry out a "rake and break," whereby a window near the front door was broken to create a diversion. (*Id.* ¶ 71.) The plan involved the "rake and break" as opposed to a front door breach because the front door of Moore's home was inset and posed a risk for entering officers of being caught in a funnel and shot. (*Id.* ¶ 72.) The plan also included

---

[32] Plaintiffs dispute the City's characterization of the plan as "Officer Penny's plan." Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts, ¶¶ 70–73, 75–77. Plaintiffs point out that a lieutenant and/or major in command of the TACT unit had to approve the plan. *Id.* ¶ 69; Penny Dep. 278:10–14. The Court finds that Plaintiffs have not actually shown that the plan for serving the warrant did not originate with Penny.

deploying flash bangs. (*Id.* ¶ 73.) A flash bang is used to disorient an individual with an extremely loud noise and bright light. (*Id.* ¶ 74.)[33]

This type of plan involves what is known as "dynamic entry," whereby TACT enters the residence and secures it as quickly and as safely as possible without any injures. (*Id.* ¶ 75.) TACT would not engage Moore in conversation or lengthy requests to comply with the search warrant. (*Id.* ¶ 76.)[34] The intent of the plan was to deny Moore any opportunity to set up an ambush area because TACT assumed Moore was armed and dangerous. (*Id.* ¶ 77.)

### D. TACT's Dynamic Entry on Moore's Property

Officer Penny and a TACT team of eight to ten officers arrived at Moore's residence at approximately 6:20 p.m. on January 11, 2013, in a "bear" armored vehicle, accompanied by three marked vehicles with officers. (*Id.* ¶ 78.) Officer Penny and his rear door team cut a padlock on the backyard gate, entered the backyard and stacked up at the open rear door for entry. (*Id.* ¶ 79.) Officer Penny's rear door team then announced "police, search warrant," entered the back door, and deployed a flash bang. (*Id.* ¶ 81.)[35] Officer Penny's rear door team cleared the first area they came to inside the house, deploying left and right. (*Id.* ¶ 82.) One team member saw Moore peering out of a

---

[33] The parties dispute whether it is TACT's policy to always deploy flash bangs in the execution of any search warrant or only for high-risk search warrants.

[34] Plaintiffs dispute the genesis of this portion of the plan, which according to the City was Mr. Moore's previous noncompliance, but Plaintiffs again point out that the previous encounters were without a search warrant. Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts ¶ 76.

[35] The City contends that the TACT officer at the front door additionally announced "police department, search warrant," before executing his portion of the plan; however, Plaintiffs assert that Officer Penny, whose deposition is relied on for the contention, could not possibly have known what was occurring at the front of the house due to "the use of flash bangs and the lack of dependable radio devices." *Id.* ¶ 80.

bedroom.  (*Id.* ¶ 83.)  Officer Penny and his team approached that bedroom, identifying themselves as MPD and stating they had a search warrant on two different occasions. (*Id.* ¶ 84.)[36]

The parties have made a number of assertions concerning whether Mr. Moore understood that the TACT officers were in fact police officers and that the officers were there to serve a search warrant.  No one from TACT attempted to contact Moore by telephone beforehand to inform him that a search warrant had issued.  (Pls.' Statement of Add'l Fact ¶ 114.)  It is undisputed that the officers of the TACT unit were wearing all black—black pants, black shirts, black helmets, and possibly black hoods which cover all but the eyes and nose.  (Def. Penny's Statement of Fact ¶ 122; Pls.' Statement of Add'l Fact ¶ 112.)  The TACT officers were also wearing vests with "Police" patches across the front and back and Memphis Police Department TACT Unit patches on both arms.  (Def. City of Memphis's Statement of Undisputed Fact ¶ 123.)  But it is also undisputed that none of the officers paused to show Moore any of the patches on their vests, sleeves, and backs.  (Pls.' Statement of Add'l Fact ¶ 112.)  Plaintiffs argue that a reasonable inference from the TACT unit's use of flash bangs and the general nature of the dynamic entry is that Mr. Moore could not have seen the police insignia on the officers' uniforms or heard any of the officers announcing that they were in fact police officers and were present to serve a warrant.

---

[36] Plaintiffs dispute Defendant's claim that Officer Penny called out to Moore "repeatedly."  Plaintiffs argue that Penny's testimony was he called out to Moore on more than one occasion.  Whether Penny did so repeatedly or only twice is not actually material to any of the questions of law presented at summary judgment.  In any event, the Court finds that there is no genuine dispute about the fact that Penny identified himself and the other officers as MPD and announced their purpose for being on the premises. Penny Dep. 203:2–8.

During the TACT unit's dynamic entry into the house, Moore called 911. (Def. City of Memphis's Statement of Undisputed Fact ¶ 85.) Moore's conversation with the 911 dispatcher and verbal exchange with Officer Penny was recorded. (*Id.*) The 911 operator on the telephone with Moore did not know that the TACT Unit was there serving a warrant. (Pls.' Statement of Add'l Fact ¶ 129.)[37] Moore told the dispatcher that he needed help because people were shooting weapons in his house. (*Id.* ¶ 112.) Moore could also be heard on the recording yelling for the officers to get out of his house. (*Id.* ¶ 118.) Plaintiffs argue that Moore seemed to doubt the TACT officers were actually police. (*Id.*) The City disputes this last claim and cites other statements heard on the 911 recording in which Officer Penny identified himself as a police officer and told Moore they were there to serve a search warrant. (Def. City of Memphis's Resp. to Pls.' Statement of Add'l Fact ¶ 118.) Moore could also be heard on the 911 call saying "a search warrant, no big shit." (Def. Penny's Statement of Fact ¶ 142.)[38]

Moore did not come out of the bedroom aggressively to attack or otherwise confront the TACT officers in his house and never fired his gun at them. (Pls.' Statement of Add'l Fact ¶ 135.) Officer Penny decided to secure the bedroom to which Moore had retreated. (Def. City of Memphis's Statement of Undisputed Fact ¶ 86.) One of the TACT officers unsuccessfully attempted to deploy a flash bang into Moore's bedroom.

---

[37] The City of Memphis disputes the relevance of this statement, arguing that the fact is irrelevant under the Sixth Circuit's segmenting analysis of Fourth Amendment claims. However, the City has not shown that a genuine dispute exists about the fact itself. Therefore, the Court finds that the statement is undisputed for purposes of summary judgment.

[38] Plaintiffs dispute this fact and again argue that Moore was confused about whether the officers were in fact police. Plaintiffs have not shown, however, that a genuine dispute exists about whether Moore could be heard to say these words on the 911 call.

(*Id.* ¶ 87.)  After the first attempt to lob a flash bang into the room failed, a TACT officer successfully deployed a second flash bang inside the bedroom.  (*Id.* ¶ 88.)  The purpose of a flash bang is to disorient a person temporarily, so generally where an individual is standing in the room where a flash bang is deployed, the disorientation will persist for fifteen to twenty seconds.  (Pls.' Statement of Add'l Fact ¶ 106.)

Upon the flash bang going off in Moore's bedroom, Officer Penny entered the bedroom and then turned left, which was the one area of the bedroom that he could not see.  (Def. City of Memphis's Statement of Undisputed Fact ¶ 88.)  As he turned left, Officer Penny saw Moore three to five feet in front of him, facing him with his arm extended and holding a semi-automatic pistol.  (*Id.* ¶ 89.)  Officer Penny called out "hands." (*Id.* ¶ 90.)[39]  Officer Penny then fired three shots fatally wounding Moore.  (*Id.* ¶ 92.)  Officer Penny moved laterally as he fired the shots and fell down.  (*Id.* ¶ 93.)  Officer Penny estimates that it was maybe a "second or a second and a half" from the time he entered into the room until he shot Moore.  (*Id.* ¶ 90.)  Officer Penny directed another officer to secure Moore's firearm, which the officers learned had a round in the chamber and a fully-loaded magazine.  (*Id.* ¶ 94.)[40]  Morgret and Lynch then entered

---

[39] The parties dispute whether Officer Penny also called out "gun" or "Don." Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts ¶ 91.

[40] Both Defendants state that TACT also recovered a second weapon on Mr. Moore's person, citing what is apparently an internal affairs report of the incident.  Def. City of Memphis's Statement of Undisputed Material Facts, ¶ 97; Def. Penny's Statement of Undisputed Facts ¶ 153.  However, Defendants have not made the report part of the record at summary judgment.  Plaintiffs dispute this fact, citing some "confusion" about "whether the gun on Moore's person was put there by officers after the incident, whether it was the only gun involved and remained in his holster at the time of the shooting, or was a second weapon."  Pls.' Resp. to Def. City of Memphis's Statement of Undisputed Material Facts,¶ 97 (citing Penny Dep. 256:3–9, 260:1–24, 261:22–262:21, 266:6–24, 267:10–269:24).  Some of the testimony cited shows that Officer Penny could not

Moore's residence to complete their investigation and found evidence of felony animal cruelty. (*Id.* ¶ 95.) Morgret observed a rifle next to the front door and axes by each door into the house. (*Id.* ¶ 96.)

Officer Penny's actions from the decision to cut the padlock to entering the house to following Moore into the bedroom to the use of deadly force were all fully consistent with his training and the policies and procedures of the City. (Pls.' Statement of Add'l Fact ¶ 116.) Officer Penny and TACT were tasked with a mission to serve the search warrant, and they were going to fulfill it. (*Id.* ¶ 100.)[41] TACT served the search warrant on Moore consistent with the way it has always operated. (*Id.* ¶ 101.) When serving a search warrant every time, the policy and protocol of TACT is that the officers do not "do the knock, wait and talk." (*Id.*) TACT gives about a "second and a half at the most" prior to entry." (*Id.*)[42] Once there is a search warrant, TACT, per custom and practice, will no longer give the resident the opportunity to be compliant. (*Id.* ¶ 102.)[43]

---

identify the holstered pistol and specifically did not know whether it was the same pistol he saw Moore holding just before he fatally shot him. However, none of the testimony cited shows that the weapon was recovered from Moore's person, as the City claims, or that the gun in the picture "was the only gun involved and remained in his holster at the time of the shooting," as Plaintiffs suggest. In sum, the Court finds no record evidence to show that the officers found a second weapon on Moore's person.

[41] Plaintiffs stated as fact that Officer Penny would fulfill the mission "no matter what," which the City disputes as a mischaracterization of Officer Penny's deposition. Resp. to Pls.' Additional Genuine Issues, ¶ 100 (ECF No. 132-1).

[42] The City notes that TACT officers always identify themselves as the police and state that they are entering. *Id.* ¶ 101.

[43] The City explains that this is substantially correct and is done because the individual was not compliant to begin with and TACT is concerned with allowing the individual the opportunity to set up an ambush. *Id.* ¶ 102, at 2.

Officer Penny had asked his supervisors for additional outside training for TACT for five years before this event. (*Id.* ¶ 121.) There was no policy or training in place to ensure that TACT was provided with all information necessary or that they did an independent investigation. (*Id.* ¶ 125.) TACT had faulty radio equipment that was "terrible," outdated, and "garbage to begin with." (*Id.* ¶ 126.) Officer Penny had complained for years to his supervisors regarding the equipment. (*Id.*) One of the officers entering at Moore's front door saw Moore run from the front of the house to the back. (*Id.* ¶ 127.) That information was not relayed to the rear team because of bad radios. (*Id.*) The inadequate radio equipment prevented necessary communications between the TACT officers. (*Id.* ¶ 128.) Despite some conflicts over training and equipment, Officer Penny was proud of how the TACT officers handled themselves in this event. (*Id.* ¶ 145.) Additionally, members of the City's senior management and supervisors told Officer Penny they were proud of his work serving this search warrant. (*Id.* ¶ 146.) It is undisputed that the officers in the execution of the search warrant completed the mission in conformity with their training. (*Id.* ¶ 147.)

**E. Plaintiffs' Hearsay Objections**

Plaintiffs have raised hearsay objections in their responses to each Defendant's statement of undisputed facts. The objections concern threats of violence allegedly made by Moore to his neighbors about anyone coming on his property to investigate the treatment of his animals. Defendants have offered evidence of two distinct threats allegedly made by Moore to a neighbor and then repeated to Lynch during her

investigation.[44]   The first was reported in October 2012 when a neighbor told Lynch about Moore's threats to the neighbor and her general fear of Moore.   The second was reported to Lynch after MPD officers approached Moore in January 2013 and Moore told the neighbor he was going to harm Lynch if she returned to his home.[45]   Plaintiffs object that the statements about Moore's alleged threats are inadmissible hearsay.

Plaintiff's objections are overruled.   Plaintiffs invoke the term "hearsay" but without actually developing their objection with argument and citations to authority. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" because it does not suffice "for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."[46]   Without some supporting reasoning to show why the Court should exclude the

---

[44] There is also evidence that a neighbor told MPD officers in January 2013 that Moore told the neighbor if anyone returned to his property regarding his animals, the individuals would get hurt.  Plaintiffs have not raised a hearsay objection to this proof.

[45] Morgret testified that Lynch told him Moore had remarked to a neighbor that he would "shoot first and ask questions later if officers returned to his house."  The Court finds Morgret's testimony about the threat to be problematic for a number of reasons.  It is not clear from the record whether Morgret was describing a second threat made by Moore after the January 8, 2013 visit to his home or whether he was testifying to the same threat against Lynch she described in her deposition testimony.  It is also not clear whether Morgret's testimony was a direct quote of Moore's threat, Morgret's paraphrase of the threat, or simply Morgret's characterization of Moore's threat.  Not only is Morgret's testimony ambiguous but it also consists of three layers of out-of-court statements: Moore's statement to the neighbor, the neighbor repeating the statement to Lynch, and Lynch repeating the statement to Morgret.  The Court finds it unnecessary to sort out all of these issues with Morgret's testimony.  The Court can decide Defendants' Motions for Summary Judgment without taking Morgret's testimony into account.

[46] *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 619 (6th Cir. 2014) (quoting *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir. 1997)).

evidence as hearsay, Plaintiffs have waived the issue. Plaintiffs' objections to the testimony would be overruled for this reason alone.

Even on the merits, the testimony is not hearsay. Federal Rule of Evidence 801 defines hearsay as a "statement that the declarant does not make while testifying at the current trial or hearing and a party offers in evidence to prove the truth of the matter asserted in the statement."[47] Each of Moore's threats is obviously an out-of-court statement. In point of fact, the testimony describing Moore's threats consists of two independent, out-of-court statements: (1) Moore's threat to the neighbor and (2) the neighbor's subsequent act of repeating Moore's threat to Lynch.[48] But Defendants have not introduced any of these statements to prove the truth of the matter asserted, i.e. that Moore made the threats or that the neighbor repeated the threats to the investigators.[49]

Defendants rely on the testimony about Moore's threats to establish the effect of the statements on the listener. A prior, out-of-court "statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay."[50] In each instance, Moore's threat had an impact on the listener's state of mind. Moore's threats made each listener reasonably fearful that Moore posed a risk of danger

---

[47] Fed. R. Evid. 801(c).

[48] This suggests the possibility that the testimony about Moore's threats amounts to hearsay within hearsay. Under Federal Rule of Evidence 805, the alleged threats would only be admissible if each statement can satisfy the rule against hearsay or an exception to the rule. Because the Court concludes that the alleged threats are not hearsay, the Court need not decide whether the testimony about the alleged threats runs afoul of Rule 805.

[49] Fed. R. Evid. 801(c)(2).

[50] *United States v. Churn,* 800 F.3d 768, 776 (6th Cir. 2015).

to his neighbors and the investigators.[51]  Moore's alleged threats and the fact that a neighbor repeated the threats to the investigators also had an effect on how Lynch and Morgret went about their investigation and led to their decision to request police assistance.  The statements are admissible then "to show why the listener acted as she did."[52]  In short, none of the statements constitutes hearsay because the "significance [of the testimony] lies entirely in the fact that the words were spoken."[53]  Therefore, Plaintiffs' hearsay objections are overruled.

## II. Procedural History

Plaintiffs initially filed their Complaint in Tennessee Circuit Court on January 8, 2014, seeking relief under 42 U.S.C. § 1983 for alleged deprivations of Moore's Fourth and Fourteenth Amendment rights against the City and Officer Penny, as well Director Toney Armstrong and Major Charles Morris.  Alternatively, Plaintiffs sought relief under the Tennessee Governmental Tort Liability Act against the City for the same alleged civil rights violations.  Defendants removed the case to this Court (ECF No. 1).  The City moved to dismiss Plaintiffs' Fourteenth Amendment claim under section 1983 and Governmental Tort Liability Claim (ECF No. 16), and Director Armstrong moved to dismiss all of Plaintiffs' claims against him (ECF No. 20).  Plaintiffs' moved to remand their claim under the Governmental Tort Liability Act to the state courts (ECF No. 15). The Court granted Plaintiffs' motion to remand (ECF No. 35).  The Court also dismissed

---

[51] *United States v. Meda*, 812 F.3d 502, 515 (6th Cir. 2015) (holding that a prior, out-of-court statement was admissible to prove "the impact [the statement]  had on [the hearer]'s state of mind").

[52] *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009) ("Such a statement may be admitted to show why the listener acted as she did.").

[53] *Meda*, 812 F.3d at 515 (quoting *United States v. Hathaway,* 798 F.2d 902, 905 (6th Cir. 1986)).

all claims against Toney Armstrong and the Fourteenth Amendment claim against the City, but the Court denied the motion to dismiss Plaintiffs' Governmental Tort Liability claim because it no longer had jurisdiction over the claim (ECF Nos. 45, 46). The parties then dismissed Major Morris from the action by stipulation (ECF No. 93). The remaining defendants have now moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, seeking dismissal of Plaintiffs' Fourth Amendment claims under section 1983.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[54] The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide."[55] In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party,[56] and the "judge may not make credibility determinations or weigh the evidence."[57] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a

---

[54] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[55] *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009).

[56] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[57] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

genuine issue for trial."[58]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[59]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[60]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."[61]

When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[62]  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[63]

## ANALYSIS

Both the City and Officer Penny argue that Officer Penny's actions and those of TACT did not violate the decedent's constitutional rights guaranteed by the Fourth Amendment.  The City additionally argues that Plaintiffs cannot establish municipal

---

[58] *Celotex*, 477 U.S. at 324.

[59] *Matsushita*, 475 U.S. at 586.

[60] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[61] *Lord v. Saratoga Cap., Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[62] *Anderson*, 477 U.S. at 251–52.

[63] *Celotex*, 477 U.S. at 322.

liability because Plaintiffs cannot prove either a pattern of constitutional violations by TACT or a causal link between the method of serving the search warrant and Officer Penny's use of deadly force against the decedent. Officer Penny also argues that he is entitled to qualified immunity on Plaintiffs' section 1983 claims.

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws."[64] In order to prevail on such a claim, a section 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law."[65] "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred."[66]

Defendants' contention that Plaintiffs cannot prove that Officer Penny and TACT violated the decedent's Fourth Amendment rights presents a threshold issue.[67] If no genuine dispute of material facts exists about whether Defendants violated Moore's constitutional rights, then all other issues in this case become moot. The Court will first analyze the merits of Defendants' Motions for Summary Judgment on that issue, and if Plaintiffs have sufficiently supported their claim that the decedent's Fourth Amendment

---

[64] 42 U.S.C. § 1983.

[65] *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

[66] *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001).

[67] *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372 (2007)) ("The first step must be viewed as the threshold inquiry: 'Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'").

rights were violated, the Court will go on to consider the issues of municipal liability for the City and qualified immunity for Officer Penny.

## I. Deprivation of a Right Secured by the Constitution

In their Complaint, Plaintiffs claim that TACT's dynamic entry into Moore's residence and subsequent use of lethal force deprived Moore of his freedoms from "unlawful seizure of his person," "the use of unjustified and excessive force," and "unreasonable search," all protected by the Fourth Amendment. The Fourth Amendment to the United States Constitution guarantees that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is well-settled that the "use of excessive force in the execution of a search warrant constitutes a Fourth Amendment violation"[68] and that the protections of the Fourth Amendment are applied to the City by the Fourteenth Amendment.[69] An analysis of Plaintiff's claims under the Fourth Amendment requires an objective standard of reasonableness with respect to the facts and circumstances as encountered by the officer or officers at the time of the incident.[70] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second

---

[68] *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (citing *Binay v. Bettendorf*, 601F.3d 640, 647 (6th Cir. 2010)).

[69] *Ondo v. City of Cleveland*, 795 F.3d 597, 610 n.4 (6th Cir. 2015) (citing *Mapp v. Ohio,* 367 U.S. 643, 650–55 (1961)).

[70] *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 395–96).

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[71] This calculus includes consideration of such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[72] "These factors are not an exhaustive list, as the ultimate inquiry is 'whether the totality of the circumstances justifies a particular sort of seizure.'"[73] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[74]

## A. The "Segmenting Rule"

Defendants first seek judgment as a matter of law for Plaintiffs' failure to show that Officer Penny and TACT's actions during the seizure of the decedent were objectively unreasonable. Defendants contend that the undisputed facts of the case establish that each decision made by Officer Penny and the other officers of TACT was objectively reasonable at the time it was made with the information available. The City relies on the so-called "segmenting rule" in arguing that the only relevant decision that should be analyzed is Officer Penny's decision to shoot and kill the decedent after encountering him in the bedroom. Plaintiffs respond that the decedent's Fourth Amendment protections against unreasonable search and seizure were violated well

---

[71] *Graham*, 490 U.S. at 396–97.

[72] *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

[73] *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (quoting *St. John v. Hickey,* 411 F.3d 762, 771 (6th Cir. 2005)).

[74] *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

before Officer Penny fired his weapon, and in any event, "where the evening's events are not so easily divided [Sixth Circuit cases do] not mandate that the court look at only what occurred in the moments immediately before the shooting."[75]

The Court holds that the segmenting rule provides the correct analytical framework in this case. In *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996), the Sixth Circuit acknowledged that "[s]ome of [its] cases analyze[d] excessive force claims in segments." The Court of Appeals had separately analyzed the reasonableness of each decision made by the officer where a given decision had given rise to a distinct claim of excessive force.[76] In that case, the defendant-appellants were two police officers that had responded to a call where a reportedly intoxicated man had fired nine shots.[77] "Without knocking or announcing their presence, the officers entered the house with their guns drawn through an unlocked storm door," and then, moving through the house, the officers heard the suspect yell out two threats before running toward the front door.[78] While the events that occurred next were disputed by the parties, the officers shot the suspect a total of nine times, though the suspect did not fire a single shot at either of the officers.[79]

---

[75] Pls.' Resp. and Mem. in Opp'n to Penny's Mot. for Summ. J. 18, June 25, 2015 (quoting *Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011)).

[76] *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir. 1992); *Pleasant v. Zamieski,* 895 F.2d 272, 276 (6th Cir. 1990)).

[77] *Id.* at 1154.

[78] *Id.*

[79] *Id.* at 1154–55.

The Sixth Circuit analyzed the case by "carving up the incident into segments and judg[ing] each on its own terms to see if the officer was reasonable at each stage."[80] The Court of Appeal independently analyzed the reasonableness of the defendant officers' decisions to enter into the suspect's home unannounced and then shoot the suspect as separate potential violations of the Fourth Amendment and thus separate claims under Section 1983.[81]

In *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397 (6th Cir. 2007), the Sixth Circuit likewise decided that viewing "excessive force claims in segments" was the "proper approach."[82] In that case, a stand-off arose after police confronted an individual who had failed to appear for a contempt hearing.[83] The contemnor lived in a campground and elected to barricade himself in his residence and set fire to auxiliary buildings on the campground.[84] The local sheriff's department surrounded the campground and requested assistance from the Michigan State Police's Emergency Services team "to resolve the standoff."[85] A sniper with the Emergency Services team ultimately shot and killed the man when he saw the decedent "in a crouched or kneeling position, holding his rifle at

---

[80] *Id.* (quoting *Plakas v. Drinski,* 19 F.3d 1143, 1150 (7th Cir. 1994)).

[81] *Id.* at 1162.

[82] *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (citing *Gaddis v. Redford Twp.,* 364 F.3d 763, 772 (6th Cir. 2004); *Dickerson*, 101 F.3d at 1161).

[83] *Id.* at 400–02.

[84] *Id.* at 401.

[85] *Id.*

waist level and turning his torso back and forth as if looking for someone."[86]  The sniper

believed the decedent was pointing his gun at another police officer.[87]

The Sixth Circuit analyzed the plaintiff's claim that the  commander  of  the

Emergency Services team had violated the decedent's constitutional rights by recklessly

creating the circumstances that resulted in the decedent's death.  Applying the segmented

analysis adopted in *Dickerson*, the Sixth Circuit held that the plaintiff's claim against the

commanding officer failed because the commander's decisions preceding the seizure

were immaterial.[88]  The Court of Appeals explained that courts "scrutinize only the

seizure itself, not the events leading to the seizure, for reasonableness under the Fourth

Amendment" because "[t]he Fourth Amendment prohibits unreasonable seizures, not

unreasonable or ill-advised conduct in general."[89]

Relying heavily upon *Livermore* and its progeny, the City contends that under a

segmented analysis of the events, Officer Penny's decision to shoot Moore is the only

"seizure" in this case.  Therefore, the Court should only analyze the reasonableness of

Officer Penny's decision to shoot because a Fourth Amendment segmented analysis

renders the reasonableness of all other actions immaterial.  Plaintiffs argue that the City's

application of the segmenting rule ignores any prior violation of Moore's constitutional

rights and runs afoul of the Sixth Circuit's instruction "to view the totality of the

---

[86] *Id.*

[87] *Id.*

[88] *Id.* at 407.

[89] *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (citing *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992)).  In both *Livermore* and *Dickerson*, the Sixth Circuit cited this reasoning of the Eighth Circuit with approval.  *Livermore*, 476 F.3d at 407; *Dickerson*, 101 F.3d at 1162.

circumstances" in *Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004). In *Gaddis*, one police officer attempted to pull over a man suspected of driving while intoxicated. When the plaintiff finally pulled his vehicle over, the plaintiff allegedly stepped out of the car with a knife in his hand.[90] At that point the three pursuing officers drew their weapons on the plaintiff.[91] A two-to-three minute standoff ensued until the plaintiff finally expressed a desire to leave and stepped forward.[92] When he did, one of the officers pepper-sprayed the plaintiff who reacted violently: "he wheeled and struck at [one of the officers] with his right, then his left hand. [The plaintiff]'s right-handed strike was a windmilling motion arguably suggestive of an attempt to stab with a knife."[93] Indeed, two of the other officers testified they saw the plaintiff "stab at [the officer] with a knife."[94] The officers fired a total of sixteen shots at the plaintiff who survived and filed suit under section 1983.[95]

In upholding summary judgment in favor of the officers, the Sixth Circuit stated that a reasonableness analysis under the Fourth Amendment required "a contextual inquiry that considers, in the well-known phrase, 'the totality of the circumstances.'"[96]

---

[90] *Gaddis v. Redford Township*, 364 F.3d 763, 765–67 (6th Cir. 2004).

[91] *Id.* at 767.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.* at 771.

However, contrary to Plaintiffs' position here, the Sixth Circuit discussed the line of aforementioned cases and concluded

> [i]n this circuit, courts faced with an excessive force case that involves several uses of force must generally "analyze the . . . claims separately." They should "identif[y] the seizure and procee[d] to examine whether the force used to effect *that* seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create those circumstances.[97]

Without actually using the term "segment" in its discussion, the Sixth Circuit unmistakably applied a segmenting analysis in making individual determinations of whether the defendant officers had violated the plaintiff's constitutional rights in each of the four separate uses of force contested by the plaintiff.[98]  The Court concludes that *Gaddis* actually supports a segmented analysis of the seizures in this case.

Plaintiffs also cite for support *Eibel v. Melton*, 904 F. Supp. 2d 785 (M.D. Tenn. 2012).  Again, Plaintiffs mistake "the totality of the circumstances" as somehow inconsistent with the segmenting rule when the reality is that the Sixth Circuit's segmenting rule required the district court to consider the reasonableness of each seizure under "the totality of the circumstances."[99]  In a footnote, Plaintiffs alternatively argue

---

[97] *Id.* at 772 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996); *Russo v. City of Cincinnati,* 953 F.2d 1036, 1044 (6th Cir. 1992)).

[98] *Id.*

[99] *Eibel v. Melton*, 904 F. Supp. 2d 785, 795 (M.D. Tenn. 2012) (citing *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001). ("[T]he Sixth Circuit 'embrace[s] a somewhat narrow interpretation of the Supreme Court's mandate that courts look to the totality of the circumstances in determining if excessive force is used.' . . . [T]he segmenting rule is clearly entrenched as the general rule in the Sixth Circuit . . . .").  The court then proceeded to separately analyze the alleged unreasonable seizures separately, noting

that segmenting analysis is only proper in determining the issue of an officer's qualified immunity, and the Sixth Circuit has not followed a segmented analysis in cases of municipal liability. While it is true that the officers in *Gaddis* raised the issue of qualified immunity in their initial defense, the district court never reached the issue.[100] The Sixth Circuit in *Gaddis* applied a segmented analysis to assess the reasonableness of the officers' actions in the context of municipal liability, not qualified immunity.[101]

Following the well-settled approached prescribed by the Sixth Circuit, the Court holds that the segmenting rule governs its analysis of the reasonableness of the actions taken by Officer Penny and TACT. Even so, Plaintiffs allege that the decision to deploy TACT, the officers' dynamic entry into Moore's home and the shooting of Moore all were separate violations of the Fourth Amendment.[102] Therefore, the Court will examine the reasonableness of each seizure separately, a question of law reserved for the Court.[103]

---

Effectively, Plaintiff asks this Court to ignore sixteen years of precedent in this Circuit by not applying the segmenting rule, and, in doing so, asserts that "the Sixth Circuit is continually making exceptions" to the rule. The Court finds that the segmenting rule is clearly applicable under the facts presented, and if a further exception is appropriate, or the segmenting rule is to be abandoned, that is a matter for the Sixth Circuit to determine. *Id.* at 797 (citation omitted).

[100] *Id.* at 768.

[101] *Id.* at 777 ("Because there was no underlying constitutional violation by the officers, the municipal defendants cannot be held liable to Gaddis.").

[102] The Sixth Circuit has reviewed several forms of allegedly unreasonable force that are distinct from a decision to shoot an individual, including no-knock entries and the use of flash bangs. *See, e.g.*, *Jones v. Sandusky Cnty., Ohio*, 541 F. App'x 653, 661 (6th Cir. 2013) (citing *Ramage v. Louisville/Jefferson Cnty. Metro Gov't*, 520 F. App'x 341, 346–47 (6th Cir. 2013)); *United States v. Watson*, 63 F. App'x 216, 220–22 (6th Cir. 2003).

**B. Deployment of TACT**

Before analyzing the reasonableness of the dynamic entry, the Court addresses Plaintiffs' claim concerning the decision to deploy TACT as a separate violation of the Fourth Amendment. The Complaint alleges that MPD's decision to use TACT to serve the search warrant was "unreasonable and unnecessary" and "deprived Mr. Moore of his right to be free from unreasonable, excessive, and deadly force and unreasonable search and seizure through means intentionally applied under the Fourth Amendment . . . ."[104] At summary judgment, Plaintiffs argue the MPD should have done more to evaluate Moore's mental condition based upon earlier interactions between Moore and Animal Services and Officer Edwards. Plaintiffs highlight proof that any suspicions concerning Moore's mental condition were never communicated to Deputy Director Berryhill when he approved the use of TACT or to Officer Penny or other members of TACT during the planning meeting. Such information, Plaintiffs claim, would have suggested that TACT intervention was not justified. Plaintiffs also argue MPD failed to consider alternatives to using TACT such as de-escalation techniques.

The Court finds that Plaintiff's criticism of MPD's planning and decisionmaking amounts to a negligence theory of liability for Moore's death. Whatever its merits, more

---

[103] *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (quoting *Scott v. Harris,* 550 U.S. 372, 381 n.8 (2007)) ("At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record* . . . the reasonableness of [the defendant's] actions . . . is a pure question of law.").

[104] Compl. ¶ 65 ("The unreasonable and unnecessary decision to use the TACT Unit to serve the search warrant . . . deprived Mr. Moore of his right to be free from unreasonable, excessive, and deadly force and unreasonable search and seizure through means intentionally applied under the Fourth Amendment . . . .").

than negligence is required to establish municipal liability.[105]  It is true that in a single

unpublished decision, the Sixth Circuit has analyzed the decision to deploy a SWAT team

as a separate, stand alone Fourth Amendment claim.[106]  In *Ramage v. Louisville/Jefferson

County Metro Government*, 520 F. App'x 341 (6th Cir. 2013), a SWAT team executed a

search warrant after a detective at the Louisville Metro Police Department performed a

risk assessment.[107]  The target of the search, the primary resident's adult son, was not

home during the SWAT team's execution of the search warrant, and the officers found no

incriminating evidence.  However, the SWAT team used physical force to detain the

resident and held her at gunpoint for a period of time.  The resident subsequently filed a

suit under section 1983 for injuries suffered as a result of the detention.[108]  Among other

claims, the Court of Appeals analyzed the police's decision to deploy the SWAT team as

a deprivation of the plaintiff's Fourth Amendment rights and held that the decision was

reasonable.[109]  The *Ramage* Court concluded that the police had a reasonable fear of

violence against officers serving the search warrant based upon the target of the search's

criminal history and the anticipation that he would be armed.[110]

---

[105] *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)
("A showing of simple or even heightened negligence will not suffice.").

[106] *Ramage v. Louisville/Jefferson Cnty. Metro Gov't*, 520 F. App'x 341, 346 (6th
Cir. 2013).

[107] *Id.* at 343.

[108] *Id.* at 343–44.

[109] *Id.* at 346.

[110] *Id.*

*Ramage*'s analysis of the police's decision to use SWAT, and not the actual seizure of the resident, appears to run against Sixth Circuit's precedent in excessive force cases generally, and a segmenting analysis of Fourth Amendment violations in particular.[111]   In support of the segmenting rule, the Sixth Circuit in *Dickerson* summarized why police should not be liable for all of the events leading up to a seizure and should not "be held accountable for creating the need to use excessive force by their unreasonable unannounced entry."[112]

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.[113]

Ultimately, an analysis of all of the decisions made, or not made, and the preparatory steps taken, or not taken, prior to and in anticipation of a seizure boils down to "whether it was reasonable for the police to create those circumstances" resulting in the use of force.  Outside of *Ramage*, the Sixth Circuit has consistently regarded such an inquiry as improper in the Fourth Amendment deprivation analysis.[114]

---

[111] *See e.g.*, *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (citing *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (Courts analyze "'only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment' because the 'Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general.'").  *See also Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . .").

[112] *Dickerson*, 101 F.3d at 1160.

[113] *Id.* at 1161 (quoting *Plakas*, 19 F.2d at 1150).

[114] *Gaddis*, 364 F.3d at 772 (quoting *Dickerson*, 101 F.3d at 1161).

The Court need not resolve the apparent discrepancy between *Ramage* and the rest of the Sixth Circuit's Fourth Amendment jurisprudence. The undisputed facts in this case show that the MPD's decision to deploy TACT necessarily included the decision to use dynamic entry techniques. According to Officer Penny's testimony, once TACT is involved in serving a search warrant, the searchee will be given no further opportunity to comply with the warrant or any opportunity to set up an ambush. In other words, the decision to use TACT largely merges with Plaintiffs' claims about the reasonableness of the no-knock entry and the use of flash bangs. Therefore, the decision to deploy TACT is indivisible from the execution of a dynamic entry and is better analyzed in that context.

## C. Dynamic Entry

Plaintiffs challenge two aspects in particular of TACT's "dynamic" entry into Moore's residence as unreasonable under the Fourth Amendment: the (1) "no-knock" entry and (2) use of flash bangs. The Court will consider each aspect of the dynamic entry separately, but because both occurred simultaneously as the result of the plan to execute the search warrant on Moore, the Court will not treat these actions as separate alleged deprivations under section 1983. The execution of the dynamic entry plan as a whole must be evaluated for reasonableness, though necessarily, should either the "no-knock" entry or the deployment of flash bangs be found to be unreasonable, the dynamic entry as a whole will be found unreasonable, and as a result, an illegal deprivation of the decedent's Fourth Amendment rights. For reasons set forth below, the Court finds that the dynamic entry was reasonable under the totality of the facts and circumstances of this case.

## 1. No-Knock Entry

The Supreme Court acknowledged in *Wilson v. Arkansas*, 514 U.S. 927 (1995), that the Fourth Amendment right to be protected within one's home from unreasonable search and seizure by the State as guaranteed by the Fourth Amendment finds its roots in the common law:

> [C]ommon-law courts long have held that "when the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process . . . . *But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors* . . . for perhaps he did not know of the process, of which, if he had notice, it is to be presumed that he would obey it . . . ."[115]

The Court held the "principle of announcement" to be a part of "the reasonableness inquiry under the Fourth Amendment," concluding that it was "embedded in Anglo-American law."[116] Writing for the Court, Justice Thomas traced that protection through the centuries from English common law that predated the Founding Era to the States' ratification of the Fourth Amendment, noting that a few states even codified it.[117] However, the Court continued:

> This is not to say, of course, that every entry must be preceded by an announcement. The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests. . . . [T]he common-law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances.[118]

---

[115] *Wilson v. Ark.*, 514 U.S. 927, 931–32 (1995) (quoting *Semayne's Case* (1604) 77 Eng. Rep. 194, 195–96; 5 Co. Rep. 91a, 91b (QB)) (emphasis added).

[116] *Id.* at 934 (quoting *Miller v. United States*, 357 U.S. 301, 313 (1958)).

[117] *Id.* at 932–33.

[118] *Id.* at 935 (citing *Ker v. Cal.*, 374 U.S. 23, 38 (1963).

"[T]he common-law rule," wrote Justice Thomas, "was justified in part by the belief that announcement generally would avoid 'the destruction or breaking of any house . . . by which great damage and inconvenience might ensue . . . .'"[119]  Thus, "the presumption in favor of announcement would yield under circumstances presenting a threat of physical violence."[120]   The Court elaborated on this exception to the announcement rule in *Richards v. Wisconsin*, 520 U.S. 385 (1997):  "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, *would be dangerous* or futile, or that it would inhibit the effective investigation of the crime . . . ."[121]

Under the totality of the circumstances, the Court holds that the no-knock entry was justified.   The undisputed evidence shows that Moore had had a number of encounters with Lynch and MPD officers as part of the investigation into Moore's treatment of his animals.  During the October 15, 2012 encounter, Moore refused to show

---

[119] *Id.* at 935–36 (quoting *Semayne's Case*, 77 Eng. Rep. at 196; 5 Co. Rep. at 91b).

[120] *Id.* at 936 (citing *Read v. Case*, 4 Conn. 166, 170 (1822); *Mahomed v. The Queen* (1843) 13 Eng. Rep. 293, 296; IV Moore 239, 247 (PC)).  The Court also provided additional situations where a no-knock entry would be justified, but it noted that this was not an exhaustive list, ultimately leaving "to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment."  *Id.*

[121] *Richards v. Wis.*, 520 U.S. 385, 394 (1997) (emphasis added).  The Court explained:

> This standard—as opposed to a probable-cause requirement—strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries.  This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged.

*Id.* at 394–95 (citing *Md. v. Buie*, 494 U.S. 325, 337 (1990); *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

the officers his hands and gestured as if he had a weapon behind his back. According to Lynch, she was so fearful for her own safety she took up a position away from Moore and the MPD officers. Following a second encounter on January 8, 2013, Lynch received a report from one of Moore's neighbors that Moore had come out of his home with a gun and told the neighbor that if Lynch returned to his home, he would kill her. Morgret also testified to his concerns about Moore's "shoot first and ask questions later" threats. When Lt. Col. Worthy sent officers to investigate further, a neighbor conveyed reports of similar threats made by Moore. Based on all of these facts, MPD reasonably believed that Moore threatened to use deadly force against anyone that returned to his property to inquire about his animals. As Officer Penny testified in his deposition, the purpose of the no-knock entry was to prevent Moore from setting up an ambush of the officers as they entered his residence. In sum, the evidence shows MPD had a reasonable fear for officer safety and opted to employ TACT and proceed with a no-knock entry out of such a fear of violence.

Plaintiffs dismiss Defendants' safety concerns and argue that officer safety in this case could not provide an exception to the announcement rule. The Supreme Court in *Richards* rejected Wisconsin's default rule that felony drug investigations always amounted to exigent circumstances permitting a no-knock entry. According to Plaintiffs, the "allegations against Mr. Moore do not even approach the type [of] exigent circumstances" at issue in *Richards*. Even assuming arguendo that the circumstances surrounding an animal cruelty charge are less severe than those of a drug charge, Plaintiffs misapply the relevance of *Richards*. The Supreme Court did not reject the Wisconsin rule in *Richards* because of any lack of danger to police officers inherent in

felony drug charges; the Court rejected the rule because it was too inclusive. Wisconsin argued that the rule was necessitated by a violent culture that surrounded felony drug crimes, but the Court reasoned that not every drug investigation presented "special risks to officer safety," and "in each case, it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement."[122] Here, neither Officer Penny nor the City of Memphis asserts that TACT's dynamic entry is the proper method of serving a search warrant for every animal cruelty investigation. Defendants merely argue that a no-knock entrance was reasonable under all of the circumstances in this instance, which is all that the Supreme Court has required.

Plaintiffs cite two opinions from the Sixth Circuit in support of their contention that this case factually does not fall within the exigent circumstances that permit police officers to dispense with the requirement to knock and announce their presence. The cases cited by Plaintiffs, however, are distinguishable from the case at bar. In both *United States v. Watson*, 63 F. App'x 216 (6th Cir. 2003), and *United States v. Bates*, 84 F.3d 790 (6th Cir. 1996), the defendant police officers proceeded with a no-knock entry on the grounds that they suspected individuals possessed firearms on the premises.[123] In *Bates* and *Watson*, the Sixth Circuit held no-knock entries to be unreasonable because "[e]vidence that firearms are within a residence, by itself, is not sufficient to create an

---

[122] *Id.* at 392–94. The Court ultimately found that the officers "no-knock" entry was reasonable.

[123] *United States v. Watson*, 63 F. App'x 216, 219 (6th Cir. 2003); *United States v. Bates*, 84 F.3d 790, 793 (6th Cir. 1996).

exigency . . . ."[124]  However, the Sixth Circuit noted that "threats to an officer's safety . . . can be enough to provide law enforcement officers with justification to forego the necessity of knocking and announcing their presence."[125]  This is precisely what MPD encountered in this case.  The suspected presence of a weapon, which, while later confirmed, was only a suspicion at the time TACT executed the dynamic entry, taken together with Moore's threats to others about officers and investigators coming onto his property, rises to the level of an exigent circumstance.  These facts more than satisfy the Supreme Court's formulation in *Wilson* and *Richards* of exceptions to the announcement principle and the Sixth Circuit's decisions fleshing out those exceptions.  The Court concludes that the decision to proceed with TACT and a no-knock entry was reasonable under the totality of the circumstances.  Therefore, the no-knock entry did not violate the decedent's constitutional rights.

### 2. Deployment of Flash Bangs

A flash bang is "[a] device that creates a bright flash of light and a loud sound (sometimes with smoke), deployed usu[ally] during the execution of a no-knock search warrant to surprise and distract a suspect who may be dangerous or who may try to destroy evidence."[126]  "When used properly [flash bangs] cause minimal damage and officers use them to stun or distract the occupants of a home and keep them from creating

---

[124] *Bates*, 84 F.3d at 795 (citing *United States v. Nabors*, 901 F.2d 1351, 1354 (6th Cir. 1990)).

[125] *Id.*

[126] *Flash-Bang Diversionary Device*, BLACK'S LAW DICTIONARY (10th ed. 2014).

a safety threat."[127]  However, "serious injuries . . . may arise from the use of a flash-bang device during a search," and "[e]ven when use of a flash-bang device has not resulted in actual, physical harm, courts have in some circumstances justifiably questioned the device's use."[128]  "The use of a flash-bang is 'neither per se objectively reasonable nor unreasonable.'"[129]  The Sixth Circuit has cautioned that "the use of flash-bang devices will be inappropriate" in many cases but ultimately concluded that "the reasonableness of the device's use . . . depends upon the facts and circumstances of each case."[130]

The Court holds that under the totality of the facts and circumstances, TACT's use of flash bangs in serving the search warrant was an objectively reasonable response to a perceived threat.  While the use of flash bangs may be unreasonable in some cases, the Court finds their use to be reasonable in this instance for the same reasons that the no-knock entry was reasonable.  The Sixth Circuit in *Dawkins* recognized that the reasonableness of the deployment of flash bangs is evaluated in the same manner as the reasonableness of a no-knock entry.[131]  In that case, the police officers deployed flash bangs in the execution of a search warrant, and the Court of Appeals determined the use of the devices was reasonable because the officers had probable cause that the searchee

---

[127] *Ramage v. Louisville/Jefferson Cnty. Metro Gov't*, 520 F. App'x 341, 346 (6th Cir. 2013).

[128] *See, e.g.*, *United States v. Folks*, 236 F.3d 384, 388 (7th Cir. 2001) (citations omitted).

[129] *United States v. Dawkins*, 83 F. App'x 48, 51 (6th Cir. 2003) (quoting *Kirk v. Watkins*, 182 F.3d 932 (table), 1999 WL 381119, at *3 (10th Cir. June 11, 1999).

[130] *Id.* (citing *Molina v. Cooper*, 325 F.3d 963, 973 & n.6 (7th Cir. 2003); *Folks*, 236 F.3d at 387–88; *Watkins*, 1999 WL 381119, at *4; *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997); *Jenkins v. Wood*, 81 F.3d 988, 996–98 (10th Cir. 1996) (Henry, J., concurring)).

[131] *Id.* (citing *Folks*, 236 F.3d at 387–88; *Myers*, 106 F.3d at 940).

had a weapon and they thought he was likely to be violent due to a previous felony conviction.[132]  Just as the MPD's no-knock entry was reasonable in this case, it was likewise reasonable for TACT to deploy flash bangs due to Moore's threat of violence against anyone coming back to his home to investigate the treatment of his animals and the suspected presence of a deadly weapon on Moore's person or in his home.[133]

Plaintiffs contend that TACT's use of flash bangs was objectively unreasonable and thereby unconstitutional because Officer Penny did not take the appropriate "facts and circumstances" into consideration.  Plaintiffs rely on the Sixth Circuit's holding in *United States v. Dawkins*, 83 F. App'x 48 (6th Cir. 2003).  It is true that the police in *Dawkins* had a warrant to search for weapons and believed that the searchee "more than likely" possessed an AK-47; whereas, here MPD had only a reasonable suspicion that Moore possessed a handgun.  Even so, in light of the reasonable suspicion that Moore would be armed *and* Moore's apparent threat of violence against any individual that came to his residence regarding his animals, Officer Penny and the other TACT officers reasonably feared substantial bodily harm or death that justified the use of flash bangs. Because the deployment of flash bang devices was reasonable under the totality of the circumstances, the Court concludes that the use of the flash bang devices did not violate Moore's constitutional rights.

### D. Officer Penny's Decision to Shoot Moore

Plaintiffs next contend that Officer Penny's decision to shoot Moore was objectively unreasonable and thus amounted to a deprivation of his Fourth Amendment

---

[132] *Id.*

[133] *See Watkins*, 1999 WL 381119, at *3.

rights in violation of section 1983. In moving for summary judgment on this claim, Defendants argue that Plaintiffs cannot demonstrate that Moore's Fourth Amendment rights were violated because there is no evidence to contradict Officer Penny's testimony that Moore had pointed a gun at him. Plaintiffs counter that there is a factual dispute as to whether Moore had his gun pointed at Officer Penny in the moments before the fatal shooting and contest Officer Penny's account of that shooting, arguing these amount to genuine issues of material fact. If such issues existed, it would obviously be fatal to the Defendants' Motions for Summary Judgment, and so the Court must first address them before it may permissibly inquire into the reasonableness of Officer Penny's decision to fire his weapon.

**1. Genuine Issues of Material Fact**

The standard of review for a motion for summary judgment has been explained above, but the Court will reiterate a portion of its discussion of the standard:

> When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."

Plaintiffs state that there is "a factual dispute as to whether Mr. Moore ever pointed a gun at Officer Penny," referencing the fact that Moore was on the phone with 911 at the time of the shooting. Plaintiffs hypothesize that perhaps Officer Penny mistook a phone for a gun. Plaintiffs also point out a photograph of Moore's gun in a holster and suggest a "possibility the gun never left the holster." These are certainly possibilities, but as Judge

Learned Hand once opined, "if a motion for summary judgment is to have any office whatever, it is to put an end to such frivolous possibilities when they are the only answer."[134] "The 'mere possibility' of a factual dispute is not enough"; "[r]ather, in order to defeat summary judgment a plaintiff 'must come forward with more persuasive evidence to support [his or her] claim than would otherwise be necessary.'"[135] The proof with which Plaintiffs support their contentions must be more substantial than speculation, and Plaintiffs fail to provide more than that. Plaintiffs fail to raise any evidence that contradicts Officer Penny's assertion that Moore was pointing a semiautomatic pistol at him when Officer Penny fired at Moore. While a great many things *possibly* could have occurred, the Court is confined to what the undisputed evidence shows did occur.

Plaintiffs additionally challenge Officer Penny's account of the shots that struck and killed Moore as untruthful, but in doing so, Plaintiffs point only to the autopsy report, which only describes Moore's fatal wounds. The Sixth Circuit has held that, without expert testimony to support the contention, an argument that the bullet pathways described in a coroner's report does not match up with the police officers' testimony is insufficient to raise a genuine issue of material fact.[136] Thus, without raising any

---

[134] *BuDeluca v. Atl. Ref. Co.*, 176 F.2d 421, 423 (2d Cir. 1949).

[135] *Allen v. Wal-Mart Stores, Inc.*, 602 F. App'x 617, 621 (6th Cir. 2015) (The plaintiff "cannot survive summary judgment through speculation or conjecture."); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citations omitted).

[136] *Whitlow v. City of Louisville*, 39 F. App'x 297, 307 (6th Cir. 2002) ("There is no evidence that contradicts the statements of the officers. Unfortunately, Whitlow was the only other eye witness to the incident. Plaintiff attempts to raise a material issue of fact as to the path of the bullets by pointing out in his brief that the coroner's report states that the first bullet entered the right back area and the second bullet entered at the right side of the chest . . . . He provides no expert testimony to support his opinion . . . .").

supporting expert testimony, Plaintiffs again engage in mere speculation and do not

demonstrate sufficient evidence to support their claims.[137]

Plaintiffs also rely on a Ninth Circuit opinion, *Scott v. Henrich*, 39 F.3d 912, (9th

Cir. 1994), addressing the danger inherent in deadly force cases. The relevant portion

from *Henrich* reads as follows:

> Deadly force cases pose a particularly difficult problem under this regime
> because the officer defendant is often the only surviving eyewitness.
> Therefore, the judge must ensure that the officer is not taking advantage of
> the fact that the witness most likely to contradict his story—the person
> shot dead—is unable to testify. The judge must carefully examine all the
> evidence in the record, such as medical reports, contemporaneous
> statements by the officer and the available physical evidence, as well as
> any expert testimony proffered by the plaintiff, to determine whether the
> officer's story is internally consistent and consistent with other known
> facts. In other words, the court may not simply accept what may be a self-
> serving account by the police officer. It must also look at the
> circumstantial evidence that, if believed, would tend to discredit the police
> officer's story, and consider whether this evidence could convince a
> rational factfinder that the officer acted unreasonably.[138]

But this is precisely what the Court has done in this case. The Court has not simply

accepted Officer Penny's account of the shooting but considered "the circumstantial

---

[137] The Court notes that Plaintiffs' proposed expert Ron McCarthy would offer testimony that tracks with Plaintiffs' speculation here about the trajectory of the bullets. Defendants have moved to exclude McCarthy's testimony in a separately filed motion in limine (ECF No. 87). The Court did not need decide whether McCarthy's testimony about the bullet trajectory would be admissible to decide the Motions for Summary Judgment. Plaintiffs have not relied on McCarthy's testimony on this issue to oppose Defendants' Motions for Summary Judgment. Therefore, the Court declines to consider McCarthy's testimony or its admissibility here. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014) ("But [the non-moving part] did not cite any materials supporting an inference that deputies acted with deliberate indifference, and the district court 'need consider only the cited materials' [to decide a Rule 56 motion].").

[138] *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see also Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010) (citing *Henrich*).

evidence that, if believed would tend to discredit the police officer's story, and consider[ed] whether this evidence could convince a rational factfinder that the officer acted unreasonably."[139]   After careful consideration of all of the record evidence cited by the parties, the Court finds that nothing offered by Plaintiffs contradicts Defendants' evidence about the shooting to raise a genuine issue of material fact.   Therefore, the Court finds it undisputed that Moore had a weapon pointed at Officer Penny when Officer Penny made the decision to shoot Moore.

**2. Officer Penny's Decision to Shoot Moore**

Finding no genuine issues of material fact, the Court must next determine whether Officer Penny's decision to shoot Moore was objectively unreasonable under the undisputed facts and circumstances of the case.   As with the dynamic entry, this seizure must be analyzed under the Fourth Amendment's reasonableness standard.   "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments[,]"[140] and it includes consideration of "whether the suspect poses an immediate threat to the safety of the officers . . . ."[141]   "The relevant inquiry [is] whether [Officer Penny] 'had probable cause to believe that [Mr. Moore] posed a threat of serious physical harm.'"[142]   Although Plaintiffs do not squarely address

---

[139] *Henrich*, 39 F.3d at 915.

[140] *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

[141] *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

[142] *Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010) (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005)) (holding that the officer in question did not violate the decedent's constitutional rights by shooting and killing the decedent who had aimed a "semiautomatic pistol" at two officers, though it turned out the weapon was a fake).

this question, whether it is reasonable for a police officer to fire his weapon at an individual pointing a weapon at the officer has been answered conclusively. "When a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death."[143] "A police officer need not wait for a suspect to open fire on him . . . ."[144]

The facts surrounding Officer Penny's decision, discussed above, are not in genuine dispute. Officer Penny was faced with an armed individual who Officer Penny believed had previously threatened violence against him and now appeared to be openly doing so. The law requires much from those who enforce it and rightfully so, but it does not require an officer to disregard such an evident peril to his life. Following the guidance of the Sixth Circuit, the Court concludes that Officer Penny's decision to shoot Moore was objectively reasonable. Furthermore, because Plaintiffs have failed to establish facts supporting their contentions that the actions of Officer Penny and TACT were objectively unreasonable, Plaintiffs cannot prove that Mr. Moore's Fourth Amendment rights were violated. With no other constitutional rights raised, the Court holds that Plaintiffs cannot establish that the decedent suffered a deprivation of his constitutional rights.

Because the Court has concluded Plaintiffs have not established that Mr. Moore suffered a deprivation of his Fourth Amendment rights, Officer Penny's Motion for Summary Judgment is **GRANTED**. Finding no underlying constitutional deprivation,

---

[143] *Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011) (citing *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007); *Estate of Sowards v. City of Trenton*, 125 F. App'x. 31, 38 (6th Cir. 2005)).

[144] *Id.* (citing *Sowards*, 125 F. App'x at 38–39; *Boyd v. Baeppler*, 215 F.3d 594, 599–600 (6th Cir. 2000)).

the Court does not need to resolve the issue of Officer Penny's qualified immunity and dismisses Plaintiffs' claims against Officer Penny.

Likewise, because Plaintiffs cannot establish the deprivation of a constitutional right necessary to establish municipal liability, the City of Memphis' Motion for Summary Judgment is **GRANTED**. Plaintiffs have made extensive arguments concerning the failure to communicate any potential concern regarding Mr. Moore's mental condition to decision-making authorities within MPD or TACT, as well as the City's inadequate training and equipping of TACT. The segmenting analysis required for Fourth Amendment excessive-force cases precludes consideration of arguments relying on other alleged unreasonable activity that may have in whole or in part created the circumstances Officer Penny and TACT were confronted with. While the shooting death of Mr. Moore was undoubtedly tragic and even somewhat troubling to the Court, the Court holds that Defendants did not violate Mr. Moore's constitutional rights. As such, Plaintiffs' claims against the City fail as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant City of Memphis's Motion for Summary Judgment and Defendant Phillip Penny's Motion for Summary Judgment are hereby **GRANTED**. Accordingly, all claims maintained before the Court by Plaintiffs Ronald Moore, Gina Waldrop, and Donald Moore, Jr., are dismissed.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 30, 2016.